# Richmond

## CLARENCE J. PRETTYMAN v. M. J. DUER & COMPANY, INC., ETC.

March 7, 1949.

Record No. 3461.

Present, All the Justices.

The opinion states the case.

*J. Brooks Mapp* and *William King Mapp*, for the plaintiff in error.

*Dunton J. Fatherly*, for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

On April 16, 1947, M. J. Duer & Company, Inc., and George C. Bounds and William H. Phillips, partners, trading and doing business under the firm name of George A. Bounds & Company, filed their petition in the court below against Clarence J. Prettyman asking that the true boundary line between the coterminous lands of the respective parties be ascertained and established, pursuant to the provisions of Virginia Code, 1942 (Michie), section 5490.

The parties will hereinafter be referred to according to their respective positions in the trial court.

With the petition of the plaintiffs there was filed a plat made by George H. Badger, C. E., in February, 1942, showing the boundary line contended for by the plaintiffs. This line ran in a straight course from the State highway northwesterly to a point on the easterly boundary line of a tract of land called the "Harmon Farm." The defendant filed a plea of the general issue and grounds of defense, attaching to the latter a plat made by J. B. Gibb, C. E., in September, 1947, showing the boundary line claimed by the defendant. This line ran a straight course northwesterly from the State highway for a distance of 987 feet and 5 inches to a cluster of beech gum scions on the line claimed by plaintiffs, thence it turned in a more westerly direction 515 feet 9 inches to a white gum, and thence in a nearly straight line to a point marking the southeastern boundary of a tract of land called the "Harmon Farm." The western terminus of the line claimed by the defendant is approximately 400 feet south of the western terminus of the line claimed by the plaintiffs.

The plaintiffs own what is known as the "Ames Farm,"

a tract of land containing 170 acres, more or less, located near the town of Exmore in Northampton county, Virginia. They purchased the farm at a judicial sale on June 1, 1946. The deed to them, dated June 14, 1946, from a special commissioner appointed in a chancery proceeding to sell certain real estate of William Henry Ames, deceased, described the northern boundary of the farm as "the lands formerly owned by M. B. Godwin, and now owned by Clarence J. Prettyman, on the east by the county road; on the south by a cross-road; and on the west by said cross-road and the lands formerly owned by L. J. Thomas."

The plaintiffs traced a record chain of title to the Ames farm through mesne conveyances and devises to one Thomas Bell, who conveyed it by deed dated April 10, 1759, to Nicholas Bull. Omitting, for brevity's sake, intermediate transfers of title, it is sufficient to say that it was acquired by William Henry Ames, January 1, 1886, from K. F. Addison. Ames took possession in that year, and the farm was occupied by John A. Doughty, his father-in-law, until about 1902, upon the death of Ames. It was devised by Ames to his widow, Sudie W. Ames for the term of her natural life, with remainder to their children living at the time of his death and the descendants of such children as might be then dead. Thereafter until January 1, 1947, when the plaintiff took possession of the farm, it was occupied by several tenants.

By the return of processioners* dated December 17, 1884, recorded in the Clerk's Office of Northampton county, the lines of the Ames farm were given as running "northwesterly to a gum the corner line between Est. of Geo. L. J. Thomas, James Harman and sd. farm, northerly easterly to a locust the corner line between L. F. Godwin, James Harman and sd. farm east to a locust post the corner line between L. F. Godwin and sd. farm and Sarah Smith (Col'd.)".

The defendant owns what is known as the "Godwin Farm," formerly owned by J. W. Chandler, which contains

*Processioning was a former statutory proceeding for the purpose of fixing the true boundaries of landowners. Virginia Code, 1904, (Pollard) chapter 106, section 2405, *et seq.*

115 acres, more or less. This farm was sold to the defendant on July 2, 1938, in proceedings in a chancery suit for the settlement of J. W. Chandler's estate, and was conveyed to the defendant by deed dated January 9, 1940. The deed described the land as bounded on the south by the land of W. Henry Ames, and on the west by the lands of James H. Harmon. J. W. Chandler, the immediate predecessor in title to the defendant, acquired the farm from Mary J. Godwin on October 11, 1906, by a deed which gave its eastern boundary as the land of Sarah Smith and others, the southern boundary the land of W. Henry Ames, and its western boundary the lands of James H. Harmon. Prior thereto, on May 28, 1881, Mary J. Godwin had conveyed to Sarah Smith one acre, more or less, bounded on the east by the county road; on the north by Godwin; on the south by the lands of Caroline Addison (Ames Farm); and on the west by the ditch separating the same from the Godwin land. Thereafter the southern boundary line of the Godwin farm, dividing that farm from the Ames farm terminated at the southwest corner of the Sarah Smith lot at the ditch.

By the return of processioners dated January 27, 1885, recorded in the Clerk's Office of Northampton county, at the time Dr. Kendall Addison owned the Ames farm, the western line of the Godwin farm was stated as running "southerly to a locust the corner line between Dr. Addison, James Harmon and said Godwin" and the southern line as running thence "easterly to a locust post corner line between Dr. Addison, Sarah Smith and Godwin."

The lands of each of the parties are bounded on the east by a State highway.

The two plats filed with the pleadings showing the boundary line contended for by the respective parties were introduced in evidence. Several of the witnesses identified certain trees, fences, roads and other physical objects on the land as shown on the plats as marking the true boundary lines.

However, both Badger and Gibb, the surveyors who made

the plats, said they had no sure or certain knowledge of the true location of the line.

Sometime in 1941 the defendant fenced in with wire certain woodland south of the main portion of his farm and north of the main portion of the Ames farm. He put some goats within the enclosure and removed the timber within it. In September, 1941, when these facts became known to Mrs. Sudie Ames, then life tenant of the Ames farm, and to Mrs. Sudie A. Dunton and Mrs. Emily A. Coulbourn, two of the contingent remaindermen of the fee, they notified the defendant that he had encroached upon a part of their farm, requested him to remove the fence, and advised him of their intention to hold him liable for the timber taken. The defendant failed to comply with their request, and no further action was taken by the Ames' heirs.

The testimony of the plaintiffs' witnesses, so far as it relates to the location of the boundary line, is substantially as follows:

Surveyor Badger testified that he was employed in 1942 by Mrs. Sudie W. Ames, life tenant of the Ames farm, to make a survey of the line between the Ames farm and Godwin farm; that he had no personal knowledge as to the location of the line; that he did know the eastern line of the James Harmon farm since he had made a survey of said farm for the Harmon heirs in 1919; that John M. Doughty gave him directions as to the starting point of the north line of the Ames farm as the county road, at the southeast corner of the Sarah Smith lot; that Doughty located this point as best he could, the original marker being no longer standing, and then pointed out to him the course westward of the line along the Sarah Smith lot, south line, to about the edge of the woods on the Ames farm, stating that it went on straight through to the Harmon land; that pursuant to said directions he proceeded to run out the line according to the course given and that in so doing down in the swamp, 1925.5 feet from the starting point, his course ran about eleven feet north of a large old white gum tree which had definite marks of three chops on the eastern and

western sides, of the location and character usually found on marked line trees, which tree was within the enclosure set up by the defendant; that said chops or notches were in his opinion forty to fifty years old; that he found no other tree on or near the line run with line markings; that the said gum, if a line tree, could only be located on the line running east and west between the Ames and Godwin farms; that he then corrected his survey from the easternmost starting point in a straight line through the said gum tree to the eastern line of the Harmon land. The survey thus made and the line thus run, shown on his plat, was the line contended for the plaintiffs.

Badger further said that a short time after the acquisition of the Godwin farm by the defendant, he was employed by the defendant to make a survey of it. The survey was never completed because neither the owner nor the surveyor was able to locate the point on the eastern line of the Harmon farm which marked the terminal point of the western end of the dividing line between the Ames and Godwin farms.

John M. Doughty testified that he was the brother-in-law of W. Henry Ames, former owner of the Ames farm, and brother of Mrs. Sudie W. Ames, former life tenant; that his father, John A. Doughty, moved to the Ames farm in 1886 when W. Henry Ames acquired it from K. F. Addison and remained as a tenant thereof until the latter's death about 1902; that the witness, then a young man about sixteen or seventeen years of age, moved there with his father and remained there until he was twenty-two, and that he has been familiar with the farm and its lines since that time; that K. F. Addison shortly after the purchase of the farm by W. Henry Ames walked around and pointed out the lines of the farm to Ames and John A. Doughty, in the presence of the witness; that Addison pointed out the north line and stated that it was straight from the Harmon land to the county road; that he is familiar with the line as run out by surveyor Badger and that the same runs according to the directions given by him as to its course; that the northeast corner of the farm along the county road was formerly

marked by a persimmon tree which is now gone; that by measurements from the house on the Sarah Smith lot he was able to locate the point constituting the northeast corner of the Ames farm and southeast corner of the Sarah Smith lot; that he then gave to Badger a course from that point along the south line of the Sarah Smith lot to the approximate edge of a thicket on the north end of the Ames farm and directed the surveyor to run the line about that direction straight on to the Harmon land; that the course which he thus gave the surveyor when run out passed eleven feet north of the white gum, about which Badger testified, and it was then corrected to run straight from the point designated along the county road through the said gum; that the line run by Badger and shown on map exhibited by plaintiffs is according to his best knowledge and belief the true boundary line between the two farms; that the road now running down through the swamp south of the fence erected by defendant was always on the Ames farm and, at the time he first recalls the same, was between a thicket and larger woods; that it was servient to the Ames farm alone and was used by the Northampton Lumber Company in removal of timber from the Ames farm; that certain roads and fences formerly existing along the north side of the Ames farm have been removed or varied, but that the road now used on the north side of said farm shown on defendant's map by Gibb, so far as it is south of the line run by Badger, is on the Ames farm, and was used by the lumber company in removing timber; that there was formerly a road on the Godwin farm running along a thicket or woods on that farm which has now been cleared and which turned north along the ditch on the west side of Sarah Smith lot and was used by Godwin to his house; that the fence erected by defendant south of the line projected by Badger is on the Ames farm and encloses a considerable amount of the Ames farm land; that considerable timber was felled and removed by the defendant from land which is a part of the Ames farm; that his father, John A. Doughty, during the period of his tenure cultivated the cleared land up to the

line run by Badger and raked, hauled and removed pine shatters from the land now within the enclosure placed by defendant up to the line run by Badger; and that there was never during all the period of his familiarity with said Ames farm up to the time the Godwin farm was acquired by defendant any claim, assertion of right to, or act of dominion or ownership by any of defendant's predecessors in title to any land south of the line asserted by the plaintiffs.

Fred Guy testified that he was tenant of the Ames farm from 1926 to 1937; that the line between that farm and the Godwin farm was pointed out and designated to him by Mrs. Sudie W. Ames, then life tenant; that the said line was a straight line running from the southwest corner of Sarah Smith lot through the large white gum, shown on the Badger plat and now upon land enclosed by fence erected by defendant, to the Harmon line; that he had observed that gum tree many times and it was pointed out to him by Mrs. Ames as on the line; that he is familiar with the line as shown on plaintiffs' map and that as tenant of the Ames farm he cultivated the cleared land up to the line so shown, and raked and hauled pine shatters from the woods land now enclosed by defendant's fence up to the line indicated on said plat; that no question of ownership of any of the land he so used was raised by J. W. Chandler though Chandler had been out there near the line dozens of times when he was raking shatters and had talked with him.

The defendant admitted that he did not know the boundary lines of the Godwin farm at the time he acquired it. He undertook to establish its southern boundary line by the following witnesses:

A. D. Mapp, 74 years of age, said that he had lived in the vicinity all of his life; that a field road south of the line claimed by plaintiffs, leading from the main highway, had been there 55 to 60 years, and that he had presumed this road was on the Godwin property. He said he had no knowledge of the boundary line between the Ames and Godwin farms and could testify only as to the road.

Roger West, 66 years of age, said he had been living in

the vicinity 10 or 12 years; that J. W. Chandler had told him several times that the woods road south of line claimed by plaintiffs was the line between his farm and the Ames farm, and that he had cut wood and raked shatters up to this road; but he had never had any conversation about removing the shatters or about the boundary line with the owners of the Ames farm.

Calvin Bailey, a colored man about 55 years of age, testified that he had worked for J. W. Chandler on the Godwin farm practically all of his life and now lives on that farm as a tenant of the defendant; that Chandler, in the presence of Henry Dunton, husband of Mrs. Dunton, a contingent remainderman, showed him a gum tree that was marked on one side and burned on the other and told him to rake shatters no further than that; but that nothing was said by Dunton; that he was never shown any boundary between the farms; and that he is not very well now and cannot remember things he does.

Bob Webb, colored, a son-in-law of James Harmon, said he had lived on the Harmon farm 34 years; that in 1919 he met with J. W. Chandler and Henry Dunton, son-in-law of W. Henry Ames, to determine the lines between the Harmon, Ames and Godwin farms; that they walked along what purported to be a division line between the Ames and Godwin farms, the line being marked by two notched gum trees and a gum stump; that, shortly thereafter, in 1919, Badger was employed to survey the Harmon farm; that when Badger was about to start Chandler came there and pointed out to the surveyor the point which he said had been agreed upon between him and Dunton as the corner point; that the present woods road, south of the fence erected by the defendant, is north of the line claimed by defendant; and that he had no knowledge about the line north of the cleared land on the Ames farm since the woods road varied from time to time.

George Tankard, colored, 67 years of age, testified that he went on the Ames farm when he was 14 years of age and lived there about nine or ten years; that while living there

Mr. Ames pointed out to him an old gum tree as a corner line between the Ames, Godwin and Harmon farms; that this is the same gum shown within a few feet of the corner line contended for by the defendant; that Ames pointed out to him a notched tree and a dogwood tree as on the line between the two farms; and that he raked shatters up to the line. This witness was somewhat confused about certain other trees said to have been shown him.

J. E. Smith testified that he moved to the Ames farm as a tenant in 1918 and left in 1924; that Henry Dunton showed him an old stump with sprouts around it, near the edge of the field as the line marker between the farms, pointed out a gum tree with three cuts on each side and burned on the west as another line marker, and also pointed to another tree in the woods which he thought was a gum tree at the corner of the ditch, but that they did not go to this tree; that he never used the north end of the farm to get shatters, but was told by Dunton not to go over the woods road; and that other than the tree with the burns on it, he had no idea where the line between the two farms is located.

On the cross-examination of Badger, he was asked if he had not made in 1919 a survey of the Harmon farm, which bounded the Godwin farm on the west. He replied that he had. The defendant then offered in evidence the plat of that survey, as showing the point on the eastern line of the Harmon farm where the division line between the Godwin and Ames farms had its western terminus. The plaintiffs objected to the introduction of the plat as not being pertinent to the boundaries of any property, save that of the Harmon farm.

Badger, upon being further examined, said that his survey in 1919 was made at the request of the owners of the Harmon farm, and that there was no intention on his part to do more than run the correct courses and distances of the lines of their farm; that he did not undertake to locate on the eastern line of the Harmon farm any point which constituted the western end of the division line between the Ames and the Godwin farms. He was unable to remember

the source from which he obtained information about the two latter farms; and that he merely designated the names of their supposed owners from some hearsay information. He said further that he was employed by the defendant in 1940 to survey the Godwin farm; but that he abandoned the survey because neither he nor the defendant could then find any information which would enable him to ascertain the division line between that farm and the Ames farm.

The court thereupon sustained the objection of the plaintiffs to the introduction of the 1919 plat as having no probative value in the proceeding because it lacked any guaranty of trustworthiness or authority. The defendant excepted to the ruling of the court. After his witnesses testified, he did not offer the questioned plat in evidence in rebuttal of Badger's testimony.

Upon conclusion of the evidence, the jury viewed the lands in controversy. The two surveyors, Gibb and Badger, accompanied them to point out the disputed lines shown on the two plats in evidence and the physical objects designated thereon.

At the conclusion of the plaintiffs' evidence and at the conclusion of all the evidence, the defendant moved to strike the plaintiffs' evidence on the ground that they had failed to carry the legal title to their land back either to the Commonwealth of Virginia, or to some common owner. The motions were overruled, and the defendant duly excepted.

At the request of the plaintiffs, the court over the objection of the defendant, gave the following instruction:

"1. The court instructs the jury that the issue and question to be determined by them in this case is the true boundary line between the lands of the plaintiffs, M. J. Duer & Co., Inc., and George C. Bounds and William H. Phillips, partners trading as George A. Bounds & Company, and the lands of the defendant, Clarence J. Prettyman, and that by their verdict they shall find and state the true boundary line between the said lands."

At the request of the defendant, the court gave the four following instructions:

"A. The Court instructs the jury that the burden of proof in this case is upon the plaintiffs, M. J. Duer & Company, Incorporated, and George C. Bounds and William M. Phillips, partners trading and doing business under the firm name of George A. Bounds & Company, to prove to the satisfaction of the jury that they have a complete legal title to the land claimed by them, and the right to the possession thereof at the institution of these proceedings, before they can recover and that they must recover, if at all, on the strength of their own title and cannot rely on any weakness of the title of the defendant, and that in order to recover they must prove affirmatively that they are entitled to the premises, and that the defendant is not entitled to the land in question, before recovery can be had."

"B. The Court instructs the jury that where plaintiffs claim, as in this case, that the land in controversy lies within the boundaries of the patent, and of the deeds under which they claim, then the burden is on the plaintiffs to prove that the land in controversy is included within the outside boundaries of the patent and of the deeds under which they claim, and if the jury believe from the evidence that this burden has not been sustained by the plaintiffs in this case, they must find a verdict for the defendant, Clarence J. Prettyman."

"C. The court instructs the jury that the plaintiffs cannot recover by showing a conflict of claim between themselves and the defendant, but they must show affirmatively by a preponderance of the evidence that their claim to the land in question is positive, valid and complete, as the possession of the defendant, or those under whom he claims, of the premises claimed, is valid against every one, except the plaintiffs proving a superior title."

"E. The Court instructs the jury that where a private roadway has been used openly and uninterruptedly, continuously and exclusively for a period of more than twenty years, the origin of the way not being shown, there is a presumption of the right or grant from the long acquiescence of the party on whose land the way is.

"The Court therefore instructs the jury that if they believe from the evidence that the roadway shown on the plats offered in evidence by both plaintiffs and defendant, had been used openly and uninterruptedly, continuously and exclusively, for a period of more than twenty years prior to the commencement of this suit, by the defendant and his predecessors in title, then said defendant has right to continue to use said roadway."

Upon the issue submitted, the jury returned a verdict for the plaintiffs, designating the true boundary line as that shown on the plat made by George H. Badger. Upon this verdict the court entered judgment for the plaintiffs.

The defendant assigns error to the action of the court, first, in refusing to admit in evidence the 1919 plat made by Badger; second, in giving the instruction requested by the plaintiffs; and, third, in refusing to set aside the verdict of the jury as contrary to the law and the evidence and without evidence to support it.

We find no merit in the first assignment of error. The Badger plat of 1919 had no probative value in this proceeding. The survey was restricted to the Harmon lands. None of the owners of the adjoining lands authorized it or were shown to have approved it. The surveyor says that, at the time when he made the survey, he recognized no one as speaking for the adjoining owners. He says positively that he did not undertake to ascertain or to designate any boundary line, save that of his employer. The notation of the names of the adjoining owners was merely a general designation secured from hearsay information. The map wholly lacked authority and trustworthiness as to the location of the boundary line between the Ames and Godwin farms.

The case of *Reusens* v. *Lawson*, 91 Va. 226, 21 S. E. 347, relied on by the defendant is based upon a different set of facts, and, therefore, is not in point here.

We will consider next instruction number 1, given at the request of the plaintiffs. This instruction merely and simply told the jury what was the issue for their determina-

tion and their duty upon the determination of the issue. An instruction in fuller but substantially the same language was approved in *Wright* v. *Rabey*, 117 Va. 884, 885, 86 S. E. 71.

The four instructions granted at the request of the defendant instructed the jury upon whom the burden of proof rested, and the measure of proof required to establish the claim of the plaintiffs. The instructions, read as a whole, fully, clearly and fairly instructed the jury on the law of the case. We find no conflict in them.

The case of *Bradshaw* v. *Booth*, 129 Va. 19, 105 S. E. 555, does not support the contention of the defendant. In that case the court gave only one instruction to the jury. That was similar to the instruction number 1 here complained .of. The court refused to give two other instructions requested by the defendant, which are almost in the same language as instructions A and C given in this case. There two parcels of land were in dispute. One was traced to a common grantor and the verdict of the jury as to that parcel was affirmed. The title to the other parcel was neither traced to the Commonwealth nor a common grantor. No facts warranting a jury to presume a grant were offered in evidence, and, therefore, plaintiff had failed to make out a *prima facie* title. It was held that the failure to give the two instructions refused was error because the jury were given "no standard fixing what is sufficient evidence of title to real estate." It was not said that the giving of the granted instruction along with the refused instructions would have constituted error.

We come next to the final assignment of error. It is well settled in Virginia that when, in a proceeding, under Code, section 5490, to establish a boundary line, the title and right of possession of the coterminous owners are brought into dispute by the pleadings, the same principles of law are applicable as would be applicable to the same subject in an action of ejectment. *Brunswick Land Corp.* v. *Perkinson*, 146 Va. 695, 704, 132 S. E. 853; *Bradshaw* v. *Booth, supra.*

In *Brunswick Land Corp.* v. *Perkinson, supra,* where the facts were somewhat similar to those now before us, an action of ejectment was brought against a defendant who had entered upon the land of the plaintiff and cut his timber. Plaintiff traced his record title back to 1870. Holding that, upon the facts proved, he did not have to trace his title to the Commonwealth, we said at page 707:

"It is true the general rule is that a plaintiff in ejectment must recover on the strength of his own title, and, when he relies solely on his paper title, must trace it either from the Commonwealth or other common grantor, but it is equally well settled that he is not required to do this when he shows such a state of facts as will warrant the jury in presuming a grant. *Sulphur Mines Co.* v. *Thompson,* 93 Va. 293, 25 S. E. 232; *Spriggs* v. *Jamerson,* 115 Va. 250, 78 S. E. 571. And it is also well established that the prior peaceful possession by a plaintiff in ejectment, or those under whom he holds, claiming to be the owner in fee, if proved, is *prima facie* evidence of ownership and seisin, and is sufficient to authorize recovery, unless the defendant shows a better title in himself or another. *Holladay* v. *Moore,* 115 Va. 66, 78 S. E. 551."

In *Holladay* v. *Moore,* 115 Va. 66, 78 S. E. 551, the following instruction was approved:

"The court instructs the jury that the prior peaceful possession by the plaintiff or those under whom he holds, claiming to be the owner in fee, if proved, is *prima facie* evidence of ownership and seisin and is sufficient to authorize a recovery unless the defendant shall show a better title."

In *Spriggs* v. *Jamerson,* 115 Va. 250, 78 S. E. 571, we said:

"The title to be proved by the plaintiff in order to entitle him to recover, as a general rule, must either be a grant from the Commonwealth, with which he connects himself by a regular chain of title, or he must prove such a state of facts as will warrant the jury in presuming a grant, or as will show adversary possession for the statutory period under a claim of color of title."

See notes entitled "Establishment of *prima facie* title in plaintiff in ejectment by conveyance or chain of conveyance not running back to sovereignty, or to the common source of title." 10 L. R. A. (N. S.) 404 and 22 L. R. A. (N. S.) 1100, citing numerous cases from other jurisdictions which hold that where title is not traced to the State a title *prima facie* sufficient to sustain action of ejectment is made out by proving possession, or acts of ownership by a predecessor in title.

See also to the same effect 9 R. C. L., Ejectment, page 843, and 18 American Jurisprudence, Ejectment, section 25.

Here the plaintiffs have proven an unquestioned chain of record title by deeds and wills as far back as 1759, prior to the establishment of the Commonwealth. By positive evidence, they have shown peaceful possession by themselves and their predecessors in title. The processioners' returns in 1884 and 1885 show the division line between the two farms as starting at a locust post at the corner line between Dr. Addison, Harmon, and Godwin, and running easterly to another locust post, the corner line between Dr. Addison, Sarah Smith and Godwin. Badger's plat of 1942 carries the division line westwardly to the corner lines of the Ames, Godwin and Harmon farms. The eastern terminus of the line is not in dispute.

John M. Doughty, who was thoroughly familiar with the lands, pointed out the line run by surveyor Badger as the true line between the two farms. This witness said that Dr. Addison and his successors in title had used and had exclusive possession of all of the Ames farm up to that line, free from question or objection, until the time the defendant encroached upon the Ames farm. He said that for many years tenants had cultivated the cleared land and used the woodland up to the line designated by Badger, without objection from J. W. Chandler.

The evidence of Doughty and Guy was highly pertinent, material and convincing in support of the plaintiffs' contentions. Both the record and oral evidence presented a state of facts which was sufficient to warrant the jury in

presuming a grant for the land in controversy to Thomas Bell, a predecessor in title of the plaintiffs, or those under whom he claimed. It requires no stretch of the imagination to presume that a grantee has legal title to land which has been in the possession of himself and his predecessors in title for 190 years.

This case has been well briefed and ably argued by counsel for each of the parties. It is true that the evidence is in conflict on some material points. The parties differ as to its weight and materiality; but that difference presented a jury question.

As judges of the weight and sufficiency of the evidence, the members of the jury had the right to believe or disbelieve any witness. They saw and heard them testify. They viewed the disputed lines, and saw the physical objects referred to by the witnesses and shown on the plats. They were fully and fairly instructed, and accepted the evidence of the plaintiffs. It supports their verdict, which has been approved by the learned, able and experienced trial judge.

No error has been shown in the proceedings, and, therefore, the judgment complained of must be affirmed.

*Affirmed.*